# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW HAMPSHIRE

<u>Kari Smart, et al.</u>

      v.                                          Case No. 22-cv-00436-PB
                                               Opinion No. 2024 DNH 095

<u>Strafford County, et al.</u>

## <u>MEMORANDUM AND ORDER</u>

Alyssa Burson died in a jail cell on July 8, 2020, after spending more than fifteen hours in custody, initially at the Somersworth Police Department (SPD) and ultimately at the Strafford County Jail. Her estate and minor child have sued the City of Somersworth, Strafford County, and seven city and county officials. The plaintiffs' first claim is that the defendants were deliberately indifferent to Burson's need for medical care in violation of her Fourteenth Amendment right to substantive due process. They also assert that the defendants are liable for disability discrimination in violation of the Americans with Disabilities Act (ADA), wrongful death, and loss of consortium. The defendants have moved for summary judgment on all claims.

## I.  BACKGROUND

### A.  Arrest and Detention in Somersworth Police Custody

#### 1.  Officer Wentworth

On July 7, 2020, SPD Officer Jesse Wentworth responded to a shoplifting complaint at the local Walmart, where he arrested 31-year-old Burson for theft and violation of a bail order. Doc. 33-11 at 1-2. As they were leaving the premises, Wentworth noticed that Burson was breathing "like she had run a 100-yard dash." Id. at 10. When they stopped so that Burson could catch her breath, she told Wentworth that she thought she had COVID-19. Doc. 42-2 at 21.

Wentworth and Burson arrived at the police station at approximately 4 p.m. Doc. 33-11 at 2. As Wentworth searched Burson and brought her to a holding cell, Burson spoke to Wentworth about several topics, including bail and her drug use, but she did not raise her breathing issues again or mention any other health concerns. Doc. 33-5 at 4:08:52-4:14:02. Surveillance footage of her arrival at the station appears to show Burson breathing normally. Id.

Wentworth retrieved Burson from her cell and brought her to the booking room at approximately 4:45 p.m. Id. at 4:43:00. During the next twenty minutes—the most extensive period in which Wentworth was able to directly observe Burson—she was responsive to Wentworth's questions and made no comments about her health. Id. at 4:43:37-5:06:11. After Wentworth

completed the booking process, he retrieved Burson's purse from his cruiser and asked her about pills he had found inside. Doc. 33-11 at 3. She responded that she did not know what the pills were but asked Wentworth to save them because they were valuable. Id. Burson again did not raise any medical concerns with Wentworth during this exchange. Id.

Although SPD policies required officers to prepare a screening record for all detainees and seek medical assistance immediately if a detainee became sick or injured, Wentworth did not prepare a screening record for Burson or seek medical assistance on her behalf. Wentworth completed his shift shortly before 7 p.m. without seeing her again. Doc. 42-5 at 5; Doc. 42-6 at 2; Doc. 42-7 at 43; Doc. 33-11 at 3.

2.  Dispatcher Pepin

Police dispatcher Skip Pepin was responsible for monitoring Burson at the Somersworth police station through a live video and audio feed of her cell. Doc. 33-4 at 3. At the time, the police station had three holding cells. Doc. 33-11 at 2. Each cell could be observed on a video monitor together with video feeds from other areas inside and outside the station. Doc. 33-15 at 22-25. Although the monitor displayed all the video feeds simultaneously, it could play only one audio feed at a time. Id. During Burson's detention, at least one of the cells was occupied by another prisoner. Doc. 33-4 at 2.

Burson remained in her holding cell for several hours after she completed the booking process. Doc. 14 at 9-11. During this time, the video and audio footage shows Burson repeatedly pleading for help and stating that she could not breathe.[1] Id. At approximately 7 p.m., at a loud volume—though short of yelling—Burson said: "I cannot breathe in this fucking cell. Please help me. I need to go to the fucking hospital. This isn't a joke. I have been sick for three fucking months. Please help me. I can't breathe in here. I really can't do it. Please let me the fuck out of here, I really cannot breathe." Id. at 11. Burson made other similar statements during this period. Id. at 9-11.

Pepin claims that he observed Burson on the monitor approximately a dozen times during his shift but at no point did she appear to be in medical distress while he was observing her. Doc. 33-15 at 32-33. He also claims that he did not hear anything Burson was saying because he had turned the volume on the audio feed down to a level where he could only hear yelling. Id. at 59.

---

[1]    At one point during her detention, the video feed also depicts Burson using an unknown substance she had on her person when she was arrested. Doc. 33-6 at 4:28:15-4:30:13.

Burson's cell was separated from the booking area by two doors. Doc. 33-11 at 2-3. The record contains no evidence that any of the defendants heard Burson's pleas for help. Id.; Doc. 33-11 at 3; Doc. 33-13 at 3.

3.    Officer McCoy

Officer James McCoy took over for Wentworth just before 7 p.m. He checked on Burson around 8 p.m. along with a bail commissioner before transporting her to the Strafford County Jail. Doc. 42-4 at 36-38. Immediately after McCoy opened the door to her cell at 8:12 p.m., Burson told him that she "ha[d] to go to the hospital." Doc. 33-6 at 8:12:24-40. She indicated that she wanted her temperature taken and that she had been "sick for three months." Id. When McCoy told her that she would have a medical evaluation at the jail, Burson said, "That's fine." Id. While McCoy was walking Burson from her cell to his police cruiser, he observed that she did not appear to have difficulty breathing although she was pale and walking slowly. Doc. 42-4 at 38-39, 48.

Burson made additional statements that she was sick and needed medical attention during the five-mile ride to the jail. Doc. 14 at 13. Although McCoy was aware that Burson was trying to communicate with him, and he asked her to speak up, he could not hear what she was saying because McCoy was separated from Burson by a plastic barrier, the windows of the cruiser

were down, the police radio was on, and Burson was wearing a mask. Doc. 33-13 at 2; Doc. 42-4 at 42, 44; Doc. 14 at 12-13.

When McCoy and Burson arrived at the Strafford County Jail at approximately 8:25 p.m., McCoy told a booking officer that Burson had asked to have her temperature taken. Doc. 34-6 at 45. He did not mention that she had also told him that she had been sick for three months and wanted to be taken to a hospital. Id.

B.    Intake and Observations at the Strafford County Jail

1.    Medical Screening Policies and Practices

The county had several formal and informal medical screening policies and practices in place in July 2020 that guided the normal intake process at the jail. All new inmates were first screened for COVID-19 by medical personnel as soon as they entered the facility. Doc. 34-10 at 21, 29. Two written policies also established a process for more detailed medical screening before an inmate could be released into the general population. One provided that "offenders will be screened by the nurse in the Medical Exam Room in the Booking Area after the booking process has been completed and it has been determined that the offender will be housed at the facility." Doc. 43-11 at 2. The other required that a "receiving screening be completed by qualified health care personnel (nurse or medical assistant) on all new

inmate/detainees within two hours upon their reception at this facility." Doc. 43-12 at 2. Notwithstanding these written policies, officers had a well-established practice of delaying full medical exams for all new inmates who appeared to be under the influence of drugs until they were sober. Doc. 43 at 4; Doc. 43-5 at 24-27, 66; Doc. 43-4 at 18.

2.    Officer Sims

Burson was screened for COVID-19 by an unnamed nurse shortly after she arrived at the jail. Doc. 34-2 at 6. She informed the nurse on a screening tool used during the evaluation that she had been short of breath for a week and a half. Id. Burson's vital signs, however, were normal: She had a respiratory rate of 16, a 97-degree temperature, and a 100 percent blood oxygenation rate on room air. She did not exhibit any indication that she was having difficulty breathing. Id.

Officers attempted to book Burson into the jail after she completed the COVID-19 screening process. Doc. 34-1 at 8. One important step in that booking process was a full-body scan to determine whether an inmate was concealing contraband. Doc. 43-4 at 26-27; Doc. 43-5 at 24-27. Because Burson's scan was inconclusive, policy required a successful rescan before she could be admitted into the general population. Doc. 43-5 at 24-27.

Booking Officer Taylor Sims was one of the first correctional officers to have contact with Burson at the jail. Sims noticed that Burson appeared to

"have an underlying medical issue as her feet were very swollen[,] and [she] had shortness of breath." Doc. 43-3 at 10. The record does not include any evidence that Sims shared these observations with the nurse who conducted the COVID-19 screening or took any other action to make sure that his concerns were addressed by medical personnel. Instead, Sims informed the medical intake nurse at approximately 10 p.m. that "Burson was under the influence and that medical should hold off on performing a more detailed medical receiving screen." Doc. 34-1 at 8; Doc. 34-2 at 7. As a result, Burson was kept overnight in a holding cell without a medical exam.

3.    Officers Morales and McLachlin

Officers Miguel Morales and Kyle McLachlin took over for Sims at approximately 11 p.m. At that time, they were informed that Burson was under the influence of drugs or alcohol and "need[ed] a clean scan and might have possible contraband on her." Doc. 34-15 at 26-27. When they began their shifts, McLachlin and Morales did not know about Burson's swollen feet or her difficulty breathing because Sims apparently never relayed these observations before finishing his shift. Id.; Doc. 43-9 at 10.

Over the next few hours, Morales and McLachlin observed Burson in her cell from a video monitor in the booking room and, during check-ins every half hour, through the window of her cell. Doc. 34-15 at 21. Morales observed that Burson "was up all night long crying and yelling, which is behavior

8

consistent with someone who is under the influence." Doc. 34-16 at 4.

McLachlin similarly saw her crying and talking in her sleep but said he could

not understand what she was saying. Doc. 43-8 at 8, 13.

    4.    <u>Officer McDonald and Lieutenant Noseworthy</u>

Officer Jennifer McDonald came down to the booking area at

approximately 4 a.m. Doc. 34-13 at 22. When McDonald asked about who was

in Burson's cell, McLachlin repeated what Sims had told him earlier that

night: Burson was awaiting a clean scan and was believed to be under the

influence of drugs. Doc. 43-5 at 23-25.

Around 4:15 a.m., McDonald opened the door to Burson's cell to take

her to the bathroom. Doc. 33-18 at 22-23. This was the first time McDonald

had seen Burson in person, and she immediately noticed Burson's swollen

feet. Id. at 29. McDonald knew she "would need to be seen by medical." Id.

She asked Burson whether medical had seen her, and Burson said no. Doc.

34-13 at 35-36. After returning Burson to her cell, McDonald promptly

notified Morales and McLachlin of what she had seen and called the medical

team about Burson's legs. Id. at 37.

Lieutenant Laura Noseworthy, a nonmedical corrections officer,

answered the phone and told McDonald that medical staff were busy doing

blood draws. Doc. 43-13 at 37. McDonald asked whether medical was aware

of Burson's swollen legs. Id. at 38. Noseworthy then checked with Nurse

Monique O'Haire to determine whether the medical department was aware of Burson's legs. Id. O'Haire told Noseworthy that they were aware and that Burson had been seen by medical staff and been prescribed antibiotics—which was false. Id. The underlying source of O'Haire's misinformation is not clear from the record, but Noseworthy nonetheless shared what she had learned with McDonald. McDonald, presented with inconsistent accounts of whether Burson's legs had been tended to, chose to believe the information she received from Noseworthy and did not press the issue for the rest of the night. Doc. 34-13 at 46-47.

     5.    <u>Death and Autopsy</u>

Morales spoke with Burson and served her breakfast at approximately 5:30 a.m. Doc. 43-6 at 22, 29-31. Although none of the officers noticed it at the time, Burson appeared to experience significant respiratory distress approximately fifteen minutes later. Doc. 34-2 at 7. At approximately 6:30 a.m., as McLachlin did his morning rounds, he noticed that Burson appeared on the video feed to be "positioned weird in the cell," prompting him to open her cell door. Doc. 43-4 at 28. He could not find a pulse on Burson, called for medical backup, and administered CPR. Id. at 29. Further life-saving efforts were unsuccessful and Burson was pronounced dead at 7:12 a.m. Doc. 14 at 20.

Burson's autopsy report lists her cause of death as "methamphetamine and fentanyl toxicity" with "aortic valve endocarditis" as a "significant contributory condition." Doc. 36 at 6. As the report explains, "[e]ndocarditis refers to an infection of the lining of the heart or its valves and is a well-recognized complication of needle drug use, which results in bacteria entering the blood stream and colonizing the endocardial surfaces of the heart. This endocarditis would have led to an impaired ability of the heart to perform its normal pumping function, and these medical findings provide a likely explanation for the swelling of Ms. Burson's legs, as well as her complaint of shortness of breath while in custody." Id. The report also notes that two of the drugs found in Burson's system, methamphetamine and fentanyl, "may prove fatal through effects on the central nervous cardiovascular and/or respiratory systems, and drug toxicity may be enhanced when drugs are used in combination. The patient's endocarditis (and its effects on her body) would have rendered her more susceptible to these substances' toxic effects." Id.

Burson was first diagnosed with endocarditis in February 2018 when she was admitted to Wentworth-Douglass Hospital complaining of shortness of breath. Doc. 34-2 at 4. Staff at the jail learned that Burson had endocarditis in April 2018 when she was medically screened in connection with a period of incarceration at the jail. Id. at 5. Although endocarditis was again noted in June 2020 during a subsequent incarceration, Burson denied

any symptoms or cardiac conditions. Id. The record does not contain evidence that any of the individual defendants knew she suffered from endocarditis. Nor were they aware of her drug addiction.

C.    Litigation History

Kari Smart, the administrator of Burson's estate, and G.B., Burson's minor child acting through his next friend, filed their original complaint in this case on October 26, 2022. Doc. 1. They followed up with an amended complaint on February 16, 2023. Doc. 14. The only defendants named in the original complaint who remain as defendants are the City of Somersworth, SPD Officers Wentworth and McCoy, Strafford County, Strafford County Department of Corrections Superintendent Christopher Brackett, and Strafford County Jail Officers McLachlin, Morales, McDonald, and Noseworthy.[2]

Counts I and II of the amended complaint allege that defendants violated Burson's Fourteenth Amendment right to due process by being deliberately indifferent to her need for medical care. Count III alleges that the city and county defendants discriminated against her on the basis of her

---

[2]    Plaintiffs also named SPD, Strafford County Department of Corrections, and Strafford County House of Corrections as defendants. Because these entities are departments of either the county or the city, I do not treat them as independent entities.

disability in violation of the ADA. Counts IV and V respectively allege New

Hampshire state law claims for wrongful death and loss of consortium. Id.

Plaintiffs later sought permission to file a second amended complaint to

add Pepin, Sims, O'Haire, and Strafford County Jail Nurse Renee Jerram, as

defendants. Doc. 24. I denied that motion because I determined that

plaintiffs' claims against the new defendants were barred by the applicable

statute of limitation. Doc. 47.

The city and county have filed summary judgment motions on behalf of

themselves and their officers challenging all the plaintiffs' claims. Doc. 33;

Doc. 34.

## II.  <u>STANDARD OF REVIEW</u>

Summary judgment is appropriate when the record reveals "no genuine

dispute as to any material fact and the movant is entitled to judgment as a

matter of law." Fed. R. Civ. P. 56(a); Tang v. Citizens Bank, N.A., 821 F.3d

206, 215 (1st Cir. 2016). In this context, a "material fact" is one that has the

"potential to affect the outcome of the suit[.]" Cherkaoui v. City of Quincy,

877 F.3d 14, 23 (1st Cir. 2017) (quoting Sanchez v. Alvarado, 101 F.3d 223,

227 (1st Cir. 1996)). A "genuine dispute" exists if a factfinder could resolve

the disputed fact in the nonmovant's favor. Ellis v. Fid. Mgmt. Tr. Co., 883

F.3d 1, 7 (1st Cir. 2018).

The movant bears the initial burden of presenting evidence that "it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); accord Irobe v. U.S. Dep't of Agric., 890 F.3d 371, 377 (1st Cir. 2018). Once the movant has properly presented such evidence, the burden shifts to the nonmovant to designate "specific facts showing that there is a genuine issue for trial," Celotex, 477 U.S. at 324, and to "demonstrate that a trier of fact could reasonably resolve that issue in [his] favor." Irobe, 890 F.3d at 377 (quoting Borges ex rel. S.M.B.W. v. Serrano-Isern, 605 F.3d 1, 5 (1st Cir. 2010)). If the nonmovant fails to adduce such evidence on which a reasonable factfinder could base a favorable verdict, the motion must be granted. Celotex, 477 U.S. at 324. In considering the evidence, the court must draw all reasonable inferences in the nonmoving party's favor. Theriault v. Genesis HealthCare LLC, 890 F.3d 342, 348 (1st Cir. 2018).

## III.  ANALYSIS

The plaintiffs present three types of claims: Fourteenth Amendment medical care claims (Counts I and II); ADA claims (Count III); and state law wrongful death and loss of consortium claims (Counts IV and V). Defendants have responded with specific challenges to each type of claim and a common contention that all of the claims fail because plaintiffs cannot prove any of the defendants caused Burson's death.

I resolve defendants' claim-specific challenges in turn and then address the causation issue.

A.    Fourteenth Amendment Claims

　　1.    Legal Standard

When the government takes someone into custody, it has a constitutional duty to attend to their serious medical needs. If the person is in custody because of a criminal conviction, the right to medical care arises from the Eighth Amendment's prohibition of cruel and unusual punishment. See Estelle v. Gamble, 429 U.S. 97, 104 (1976). Where, as here, the person is a pretrial detainee, her right to treatment is rooted in the Due Process Clause of the Fourteenth Amendment. See City of Revere v. Mass. Gen. Hosp., 463 U.S. 239, 244 (1983). Neither the Supreme Court nor the First Circuit Court of Appeals has definitively identified the legal standard that a court must use when assessing a Fourteenth Amendment medical care claim. Both courts, however, have consistently recognized that "[t]he Fourteenth Amendment provides at least as much protection for pretrial detainees as the Eighth Amendment provides for convicted inmates." Ruiz-Rosa v. Rullan, 485 F.3d 150, 155 (1st Cir. 2007); accord City of Revere, 463 U.S. at 244.

A medical care claim based on the Eighth Amendment has both objective and subjective components. Zingg v. Groblewski, 907 F.3d 630, 635 (1st Cir. 2018). The objective component requires proof that the plaintiff is

experiencing a "serious medical need," which has been defined as a need "that has been diagnosed by a physician as mandating treatment, or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Gaudreault v. Municipality of Salem, Mass., 923 F.2d 203, 208 (1st Cir. 1990).

The subjective component focuses on whether the defendant acted with "deliberate indifference" to the plaintiff's serious medical need. Zingg, 907 F.3d at 635. This type of deliberate indifference ordinarily means that a defendant must "'know of and disregard an excessive risk to inmate health or safety.'" Lech v. von Goeler, 92 F.4th 56, 75 (1st Cir. 2024) (quoting Farmer v. Brennan, 511 U.S. 825, 836-37 (1994)) (cleaned up). Objective recklessness in the tort law sense will not satisfy the Eighth Amendment's deliberate indifference standard. DesRosiers v. Moran, 949 F.2d 15, 19 (1st Cir. 1991). Instead, deliberate indifference in this context also ordinarily requires proof that the defendant acted with "actual knowledge of impending harm, easily preventable." Id.

Although the First Circuit has continued to apply the Eighth Amendment test to Fourteenth Amendment medical care claims, see, e.g., Zingg, 907 F.3d at 634-38; Miranda-Rivera v. Toledo-Davila, 813 F.3d 64, 74-75 (1st Cir. 2016), plaintiffs argue that subjective deliberate indifference is no longer required for such claims after the Supreme Court's decision in

Kingsley v. Hendrickson, 576 U.S. 389 (2015). Kingsley considered a pretrial detainee's Fourteenth Amendment excessive force claim. The Court began its analysis by noting that an excessive force claim potentially presents two state-of-mind questions: one that concerns the actor's state of mind with respect to his actions and a second that is focused on his state of mind with respect to whether the use of force is excessive. Id. at 395. With respect to the first question, the Court followed past precedents in concluding that "the defendant must possess a purposeful, a knowing, or possibly a reckless state of mind[]" because "liability for negligently inflicted harm is categorically beneath the threshold of constitutional due process." Id. at 396. (internal quotations omitted) (emphasis in original). It then determined that the second state-of-mind requirement could be established through evidence that the force used was objectively unreasonable. Id. at 396-97.

Since Kingsley, several circuit courts have held that a Fourteenth Amendment medical care claim must be evaluated using an objective deliberate indifference standard, which has generally been understood to require proof only that the defendant acted recklessly rather than negligently with respect to a detainee's serious medical needs. See, e.g., Helphenstine v. Lewis Cnty., Kentucky, 60 F.4th 305, 316 (6th Cir. 2023); Gordon v. Cnty. of Orange, 888 F.3d 1118, 1125 (9th Cir. 2018); Miranda v. Cnty. of Lake, 900 F.3d 335, 352 (7th Cir. 2018); Darnell v. Pineiro, 849 F.3d 17, 36 (2d Cir.

2017); but see Whitney v. City of St. Louis, 887 F.3d 857, 860 n.4 (8th Cir.

2018) (applying Eighth Amendment test); Nam Dang by & through Vina

Dang v. Sheriff, Seminole Cnty. Fla., 871 F.3d 1272, 1279 n.2 (11th Cir.

2017); Alderson v. Concordia Par. Corr. Facility, 848 F.3d 415, 420 (5th Cir.

2017). Plaintiffs rely on Kingsley in asking me to follow the path established

by these circuits. As I explain, however, I need not stake out a position on the

issue because, even if I were to conclude that such a claim does not require

proof of subjective deliberate indifference, plaintiffs do not have a triable

Fourteenth Amendment medical care claim against any of the individual

defendants.

I assess the claims against the individual defendants first and then

turn to plaintiffs' claims against Somersworth and Strafford County.

    2.    Individual Defendants

Plaintiffs have asserted Fourteenth Amendment medical care claims

against several different Somersworth and Strafford County officials.

Defendants argue that plaintiffs cannot prove any of the defendants were

deliberately indifferent to Burson's serious medical needs. Precedent requires

that I assess each defendant's liability individually. See Welch v. City of

Biddeford Police Dep't, 12 F.4th 70, 76 (1st Cir. 2021); Leavitt v. Corr. Med.

Serv., Inc., 645 F.3d 484, 502 (1st Cir. 2011); Braga v. Hodgson, 605 F.3d 58,

61 (1st Cir. 2010).

### a.    Officer Wentworth

Plaintiffs argue that Wentworth was deliberately indifferent to Burson's medical needs because he failed to fill out a screening record of her, failed to seek medical care on her behalf, and failed to inform other officers that she needed treatment.

I am unpersuaded by this argument. Although Wentworth observed that Burson was having difficulty breathing while he was escorting her to his police cruiser, and she told him that she thought she had COVID-19, none of his subsequent interactions with her gave him reason to believe that Burson needed immediate medical attention. During that period, she was breathing normally, she did not ask him for medical treatment, and she did not exhibit symptoms that would have caused a reasonable officer in his position to think that she needed medical attention. Like all of the individual defendants, Wentworth had no knowledge that Burson had endocarditis. Nor is there evidence in the record to suggest that he was aware of Burson's swollen feet and legs. Although Wentworth can be faulted under these circumstances for failing to complete a screening form for Burson, the record will not support a claim that he was recklessly indifferent to Burson's medical needs.

### b.    Officer McCoy

When McCoy first encountered Burson, he was not aware that she had been short of breath earlier in the day, that she thought she had COVID-19,

or that she had swollen feet and legs. In response to Burson's initial request that she be driven to a hospital, McCoy replied that she would "get evaluated at the jail," a compromise that satisfied Burson.[3] Doc. 42-4 at 36. McCoy then drove Burson five miles to the jail, where he reasonably believed she would be seen by the on-site medical staff. Even viewing this evidence in the light most favorable to the plaintiffs, McCoy did not act recklessly in failing to take Burson directly to the hospital because he was not on notice that she needed medical care that she could not receive at the jail.

### c.    Officers Morales, McLachlin and McDonald

Morales and McLachlin were told when they started their shifts at 11 p.m. that Burson was believed to be under the influence of drugs and was awaiting a clean body scan. Neither defendant was told initially about either Burson's breathing difficulties or her swollen legs. Although they were aware that she was crying and yelling in her cell that night, both officers reasonably

---

[3]    Although Burson made several additional statements when she was in the back of McCoy's police cruiser, it is undisputed that McCoy had trouble hearing what Burson was saying, a plexiglass divider separated McCoy from Burson, Burson was wearing a mask, the windows of the cruiser were down, and the police radio was on. Doc. 33-13 at 2; Doc. 42-4 at 42, 44; Doc. 42-3 at 7. Even in a light most favorable to the plaintiffs, there is no evidence to support a finding that McCoy actually heard Burson, nor would this have made much of a difference since he had already heard her request to be taken to the hospital and have her temperature taken and he was driving her to the jail where he believed she would receive medical assistance.

attributed her behavior to the fact that she was under the influence of drugs rather than that she was in need of medical attention.

When McDonald later discovered that Burson's legs were swollen, she promptly contacted the medical department and was told, albeit incorrectly, that Burson had been seen by medical staff and had been prescribed antibiotics for her condition. She then shared this information with Morales and McLachlin. This evidence, even when viewed in the light most favorable to the plaintiffs, is not sufficient to support a claim that defendants were recklessly indifferent to Burson's medical needs.

Plaintiffs argue that Morales and McLachlin are liable because they failed to assist Burson when they first observed her crying and screaming in her cell, but plaintiffs do not challenge the officers' statements that Burson's behavior was consistent with drug intoxication rather than a serious medical condition. Nor do they argue that Burson was exhibiting symptoms of either a drug overdose or severe withdrawal, conditions that in some circumstances can give rise to a serious medical need. Instead, they point to her swollen legs and breathing difficulties as the serious medical conditions that warranted treatment, conditions that neither Morales nor McLachlin were aware of until shortly before her death.

Plaintiffs also argue that Morales, McLachlin, and McDonald were recklessly indifferent because they accepted the incorrect information from

the medical department that Burson was being treated for her condition rather than further investigating the issue on their own. This argument fails because, except in unusual circumstances not present here, the law generally encourages jail officials to defer to the professional judgments of the physicians and nurses with whom they work without fear of liability. See Berry v. Peterman, 604 F.3d 435, 440 (7th Cir. 2010). It was not reckless, therefore, for Morales, McLachlin, and McDonald to rely on the information they received from the medical department.

> d.    Lieutenant Noseworthy and Commissioner Brackett

Finally, plaintiffs have abandoned their Fourteenth Amendment claim against Noseworthy, and they have utterly failed to connect Brackett to Burson's failure to receive a medical exam. Accordingly, all the individual defendants are entitled to summary judgment on plaintiffs' Fourteenth Amendment medical care claims.

3.    <u>Somersworth and Strafford County</u>

Respondeat superior claims are not cognizable under 42 U.S.C. § 1983. Monell v. New York City Dep't of Social Services, 436 U.S. 658, 694-95 (1978). Instead, to establish a § 1983 claim against a city or county, a plaintiff must prove that:

> (1) a municipal policy maker intentionally adopted a policy,
> implemented a training protocol, or allowed a custom to develop;
> (2) the challenged policy, training protocol or custom caused a

> violation of the plaintiff's constitutional rights; and (3) the
> policymaker acted with at least deliberate indifference to the
> strong likelihood that unconstitutional conduct will result from
> the implementation of the policy, training protocol or custom.

Penny v. Middleton, 888 F. Supp. 332, 340 (D.N.H. 1994) (citing Canton v. Harris, 489 U.S. 378, 385 (1989)); accord Maldonado-Denis v. Castillo-Rodriguez, 23 F.3d 576, 582 (1st Cir. 1994). The deliberate indifference component of this test can be satisfied through allegations that a policy maker either knew or should have known of the serious risk that the challenged policy, custom, or training protocol would result in unconstitutional conduct. Canton, 489 U.S. at 389-90; Maldonado-Denis, 23 F.3d at 582; Farmer, 511 U.S. at 841 (comparing the subjective deliberate indifference test under Eighth Amendment with the objective test of deliberate indifference governing municipal liability claims); see also Wade v. McDade, 106 F.4th 1251, 1264 (11th Cir. 2024) (Jordan, J. concurring) (stating that deliberate indifference test for municipal liability is objective).

I apply this standard in evaluating plaintiffs' Fourteenth Amendment medical care claims against Somersworth and Strafford County.

### a.    Somersworth

Plaintiffs base their Fourteenth Amendment medical care claim against Somersworth on what they argue was SPD's consistent practice of failing to complete screening forms for new detainees. Plaintiffs have failed,

however, to connect this practice to an underlying constitutional violation by either Somersworth or any city employee. As a result, plaintiffs cannot maintain a Fourteenth Amendment medical care claim against Somersworth. See Bannon v. Godin, 99 F.4th 63, 88 (1st Cir. 2024) (noting that a municipal liability claim based on § 1983 requires an identifiable underlying constitutional violation); Lachance v. Town of Charlton, 990 F.3d 14, 31 (1st Cir. 2021).

      b.    Strafford County

The plaintiffs ground their constitutional claim against Strafford County on its well-established practice of delaying full medical exams for new detainees who are under the influence of drugs until they become sober. As they see it, Sims was deliberately indifferent when he followed this practice and instructed the medical department to delay Burson's full medical exam even though he knew that she was experiencing shortness of breath and had very swollen feet.

The county concedes that, "[t]he [jail] did appear to have a de facto policy to delay the more detailed evaluation until an inmate was no longer under the influence." Doc 34-1 at 24. Nevertheless, it advances several arguments in an attempt to undercut the plaintiffs' deliberate indifference claim. None of these arguments are persuasive.

24

The county first argues that its medical screening policies are constitutionally adequate when taken as a whole because all new detainees were screened for COVID-19 by a nurse, and, in any event, staff were required to immediately contact the medical department when a detainee needed immediate medical attention, regardless of whether they were under the influence. Doc. 43 at 25. The problem with this argument is that it depends on genuinely disputed issues of material fact. To the extent the county relies on its COVID-19 screening policy, it remains unclear whether such screenings were sufficiently detailed to serve as a substitute for full medical screening. Further, although there is some evidence in the record to suggest that the practice of not providing full medical exams to detainees who were under the influence was subject to an exception for detainees who required immediate medical attention, it is by no means undisputed that the exception, if it existed, was uniformly followed. Accordingly, the county is not entitled to summary judgment based on this argument.

The county next argues that its de facto policy was not deliberately indifferent because it was supported by legitimate penological interests. This argument, too, fails for want of undisputed supporting evidence. Even if the county had legitimate reasons to delay full medical exams for some intoxicated inmates, no legitimate penological interest could justify a decision to ignore a detainee's serious medical needs simply because they were

intoxicated. Accordingly, I cannot grant the county's motion for summary judgment on this basis either.

Finally, the county challenges the only evidence in the record to support plaintiffs' claim that Sims was deliberately indifferent to Burson's medical needs even though he knew that she was having breathing issues and had very swollen feet. This argument fails to persuade because the evidence plaintiffs cite can be considered in opposing a motion for summary judgment. Plaintiffs base their claim on an investigative report prepared by Strafford County Deputy Sheriff Brittney Marvin. Doc. 43-3 at 10. Marvin's statements about Sims purport, in turn, to be based on an oral statement she received from Sims during her investigation. Because both Marvin and Sims were agents of the county at the time and made their statements within the scope of their duties, their statements are admissible statements of a party opponent pursuant to Fed. R. Evid. 801.[4]

B.    **Americans with Disabilities Act Claims**

1.    **Legal Standard**

The plaintiffs allege that Somersworth and Strafford County violated Title II of the ADA by discriminating against Burson on the basis of her drug

---

[4]    Marvin's report also references a statement by Sims that medical personnel were called at some point to attend to Burson prior to her death. Doc. 43-3 at 15. I do not consider this aspect of Sims' statement because the record contains substantial evidence that calls this contention into question.

addiction. I outline the relevant law before turning to defendants' specific arguments.

To prevail on a discrimination claim under Title II, a plaintiff must show "(1) that he is a qualified individual with a disability; (2) that he was either excluded from participation in or denied the benefits of some public entity's services, programs, or activities or was otherwise discriminated against; and (3) that such exclusion, denial of benefits, or discrimination was by reason of the plaintiff's disability." Parker v. Universidad de Puerto Rico, 225 F.3d 1, 5 (1st Cir. 2000).

Courts typically recognize three types of Title II claims: "(1) disparate treatment, which arises out of the actor's prejudice; (2) disparate impact, which results from a facially neutral policy that causes a group, such as inmates with disabilities, to lose access to a program or right available to another group without a justifiable excuse for the difference; and (3) denial of a reasonable accommodation the plaintiff needed to meaningfully access a public service."[5] Snell v. Neville, 998 F.3d 474, 500 n.35 (1st Cir. 2021).

To recover compensatory damages under any of these theories, a Title II plaintiff must prove that she was the victim of intentional discrimination.

---

[5] The duty to accommodate includes the duty to "make reasonable modifications" to facially neutral practices that unreasonably burden individuals with disabilities. Sosa v. Massachusetts Dep't of Corr., 80 F.4th 15, 31 (1st Cir. 2023).

Nieves-Marquez v. Puerto Rico, 353 F.3d 108, 126 (1st Cir. 2003). Most circuit courts that have addressed the question have held that the intentional discrimination requirement can be established by proof that the defendant acted with deliberate indifference to the plaintiff's rights under Title II. See, e.g., Moore v. Western Illinois Corr. Ctr., 89 F.4th 582, 595 (7th Cir. 2023); Durham v. Kelley, 82 F.4th 217, 226 (3rd Cir. 2023); Ingram v. Kubik, 30 F.4th 1241, 1257 (11th Cir. 2022); Duvall v. Cnty. of Kitsap, 260 F.3d 1124, 1138 (9th Cir. 2001); but see J.W. v. Paley, 81 F.4th 440, 449-50 (5th Cir. 2023) (requiring "something more" than deliberate indifference).

The First Circuit has not taken a position on whether anything more than deliberate indifference is required but it has held that deliberate indifference is the "bare minimum" that could satisfy the requirement. Gray v. Cummings, 917 F.3d 1, 18 (1st Cir. 2019). Deliberate indifference in the context of a Title II claim "requires proof that the defendant knew that an ADA-protected right was likely to be abridged, yet neglected to take available preventative actions notwithstanding such knowledge." Id.

To prove that a public entity is directly liable for damages under Title II, a plaintiff must establish either that the employer's "existing policies caused a failure to adequately respond to a pattern of past occurrences of injuries like hers" or "that the risk of cognizable harm was so great and so

obvious as to override the requirement of demonstrating a pattern." Id. (internal quotations omitted) (cleaned up).

A circuit split exists as to whether a public entity can ever be held vicariously liable for an employee's Title II violation. Compare Ingram, 30 F.4th at 1258, and Jones v. City of Detroit, 20 F.4th 1117, 1122 (6th Cir. 2021) (holding that there cannot be vicarious liability for a Title II violation), with Duvall, 260 F.3d at 1141 (holding that there can be vicarious liability). Although the First Circuit remains undecided on the issue, it has made it clear that if vicarious liability exists at all, a plaintiff must prove that the employee whose actions gave rise to the claim was himself deliberately indifferent to the plaintiff's rights under the ADA. Gray, 917 F.3d at 18.

2.  Application

Viewed generously, defendants present three arguments in support of their challenges to the plaintiffs' Title II claims. First, they argue that the plaintiffs cannot claim that Burson was a qualified individual with a disability because she was using illegal drugs during her detention. Second, they argue that plaintiffs are asserting a generalized claim for inadequate medical care, which is not cognizable under Title II. And third, Somersworth, by itself, argues that plaintiffs cannot prove that it acted with deliberate indifference to Burson's claimed disability. I address each argument in turn.

a.    Qualified Person with a Disability

Plaintiffs cite Burson's drug addiction as her qualifying disability. Defendants do not challenge either plaintiffs' contention that Burson was addicted to drugs or their legal argument that drug addiction can be a qualifying disability. Instead, they invoke 42 U.S.C. § 12210(a) in arguing that Burson cannot be considered disabled because she was engaging in illegal drug use during her detention. Section 12210(a) provides that "the term 'individual with a disability' does not include an individual currently engaging in the use of illegal drugs." 42 U.S.C. § 12210(a). Defendants then argue that Burson is subject to this provision because she was under the influence of drugs during her detention.

Defendants, however, have failed to address how, if at all, Burson's status under Title II is affected by § 12210(c), which provides in pertinent part that "[n]otwithstanding subsection (a) [. . .] an individual shall not be denied health services [. . .] on the basis of the current illegal use of drugs if the individual is otherwise entitled to such services." Id. § 12210(c). Because plaintiffs allege that Burson was denied health services, and neither party has explained how defendants' reliance on § 12210(a) is affected by § 12210(c), I decline to take up the issue on my own.

b.    Claim for Inadequate Medical Care

Defendants next argue that plaintiffs are improperly attempting to use Title II to assert a generalized claim for medical care. This argument is a nonstarter because it mischaracterizes plaintiffs' claim. The ADA protects individuals with disabilities from discrimination on the basis of their disability. Plaintiffs are claiming that defendants denied Burson medical services that other nondisabled individuals would have received because of her disability. This is precisely the kind of claim that the ADA was developed to address.

c.    Deliberate Indifference

Somersworth also argues that the record contains insufficient evidence to support a claim that it acted with deliberate indifference to Burson's disability when its officers failed to provide her with medical care before transferring her to the Strafford County Jail. Doc. 33-1 at 20-21. Plaintiffs' respond to this argument by asserting without evidence that "[b]oth Officer Wentworth and Officer McCoy knew that Alyssa was suffering from a serious medial condition that required treatment and they acted with deliberate indifference when they refused to seek medical treatment on her behalf." Doc. 42 at 17.

Based on the plaintiffs' response to Somersworth's argument, I understand it to assert that the city is vicariously liable for the deliberate

indifference of Wentworth and McCoy. To survive Somersworth's summary judgment challenge though, plaintiffs, at a bare minimum, must respond with sufficient evidence to support a finding that either Wentworth or McCoy "knew that an ADA-protected right was likely to be abridged, yet neglected to take available preventative action notwithstanding such knowledge." Gray, 917 F.3d at 18. Plaintiffs have failed to satisfy this standard for substantially the same reasons that I found plaintiffs' Fourteenth Amendment medical care claim against the city wanting. Accordingly, Somersworth is entitled to summary judgment on plaintiffs' Title II claim.

C.    Wrongful Death and Loss of Consortium Claims

Defendants also argue that they are immune from liability for wrongful death and loss of consortium pursuant to RSA 507-B. N.H. Rev. Stat. Ann. § 507-B. Plaintiffs concede that Somersworth and Strafford County are immune but maintain that they can pursue their claims against the individual defendants.

Under New Hampshire law, chapter 507-B protects political subdivisions of the state and their employees from certain tort claims. Section 507-B:5 establishes the general rule that "[n]o governmental unit shall be held liable in any action to recover for bodily injury, personal injury or property damage except as provided by this chapter or as is provided or may be provided by other statute." Id. § 507-B:5. Section 507-B:1(I) specifies that

cities and counties are covered "governmental units" and § 507-B:1(II) provides that a wrongful death action is a covered action for "bodily injury."[6]

Section 507-B:4(IV) shields employees from liability to the same extent as governmental units "so long as said employee or official was acting within the scope of his or her office and reasonably believed in the legality of his or her actions." Id. § 507-B:4(IV). Because plaintiffs concede that the city and county are immune from suit, and they do not dispute that the individual defendants were acting within the scope of their offices, the individual defendants are also immune if they reasonably believed in the legality of their actions.

The New Hampshire legislature added the "reasonable belief" requirement to § 507-B:4(IV) in 2018. See 2018 N.H. Laws 113. But in doing so, it merely codified holdings from two earlier New Hampshire Supreme Court decisions. In Huckins v. McSweeney, 166 N.H. 176, 182 (2014), the court determined that § 507-B:5 immunity is subject to a reasonable belief requirement. And, in Farrelly v. Concord, 168 N.H. 430, 443 (2015), the court held that the reasonable belief requirement applies to common law official immunity. Farrelly also explained two things about the reasonable belief

---

[6]     Section 507-B:2 carves out an exception to immunity under § 507-B:5 for claims "arising out of ownership, occupation, maintenance, or operation of all motor vehicles, and all premises" but this exception has no bearing on the present case. N.H. Rev. Stat. Ann. § 507-B:2.

requirement that have a bearing on the present case. First, it concluded that the requirement has both subjective and objective components. Id. And second, it made clear that the requirement is identical to the "reckless or wanton" standard that had previously been a requirement for common law immunity claims. Id. at 446. Thus, by codifying the reasonable belief standard in § 507-B:4(IV) as it had been developed and explained in Huckins and Farrelly, the legislature left no doubt that an employee of a governmental unit who is sued for causing bodily injury, personal injury, or property damage while acting within the scope of his employment is entitled to immunity under § 507-B:4 unless he was acting recklessly or wantonly. Rancourt v. Hillsborough Cnty., No. 20-CV-351-PB, 2022 WL 1693631, at *4 (D.N.H. May 26, 2022).

As I have already explained when discussing the Fourteenth Amendment claims, the plaintiffs have failed to muster sufficient evidence against any of the individual defendants to support a claim that they acted recklessly in their dealings with Burson. Nor do I see a basis in the record to call any individual defendant's subjective belief as to the lawfulness of their conduct into question. Accordingly, the defendants are also entitled to summary judgment on plaintiffs' wrongful death and loss of consortium claims.

D.    Causation

Each claim at issue in this case requires proof of a causal link between a defendant's improper actions and the damages the plaintiffs seek to recover. See Memphis Cmty. Sch. Dist. v. Stachura, 477 U.S. 299, 309-10 (1986) (addressing causation requirement for § 1983 claims); Carey v. Piphus, 435 U.S. 247, 256-57 (1978); Acevedo-Garcia v. Monroig, 351 F.3d 547, 567-68 (1st Cir. 2003); see also Buchanan v. City of San Antonio, 85 F.3d 196, 199-200 (5th Cir. 1996) (addressing causation requirement for ADA claim); Mayer v. Town of Hampton, 127 N.H. 81, 85 (1985) (addressing causation requirement for wrongful death claims). Defendants rely on these generally accepted legal principles in arguing that they are entitled to summary judgment on all of plaintiffs' claims because they cannot prove that any of the defendants caused Burson's death.

To support their argument, defendants point to the declaration of their expert, Dr. Rebecca Ballard. Dr. Ballard, a full-time correctional medical physician, concluded that Burson suffered from destructive aortic valve endocarditis that had progressed to the point that she needed an emergency valve replacement. Doc. 34-2 at 8. As a result, she concluded that even if the defendants had discovered the extent of Burson's illness when she was initially detained, the defendants did not have sufficient time to arrange the emergency surgery she needed to replace her defective valve. Id. at 9.

Plaintiffs have failed to respond to Dr. Ballard's declaration in any meaningful way.

Although the question of whether emergency valve replacement surgery could have been arranged in time to save Burson's life can only be answered by someone with medical expertise, plaintiffs have not retained an expert witness to address the issue. Nor have they even explained in their summary judgment memoranda how a jury could answer this question without the assistance of an expert. Instead, I am left to speculate as to how plaintiffs can satisfy this essential element of their claims.

Plaintiffs argue for a different result by pointing out that Dr. Ballard and the medical examiner disagree as to whether Burson died as a result of an aortic valve collapse that could have been hastened by recent drug use, as Dr. Ballard contends, or whether she died from drug toxicity with aortic valve endocarditis as a significant contributing factor, as the medical examiner concludes. According to the plaintiffs, this disagreement "by itself creates a genuine issue of material fact on the record." Doc. 43 at 15-16.

I am unpersuaded by plaintiffs argument. Defendants fault the plaintiffs for failing to respond to their summary judgment motion with evidence of their own that, if believed, could convince a jury that defendants caused Burson's death. Pointing to a difference between Dr. Ballard and the medical examiner over whether aortic valve endocarditis was a primary or

contributing factor in Burson's death does nothing to fill the gap in the plaintiffs' evidence on an essential element of their case. The Supreme Court has recognized in Celotex Corp. v. Catrett:

> In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is "entitled to judgment as a matter of law" because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.

477 U.S. at 322-23.

This case bears a sad similarity to a recent Seventh Circuit case involving an inmate who died of endocarditis while in custody. See Stockton v. Milwaukee Cnty., 44 F.4th 605, 616 (7th Cir. 2022). There, in rejecting Eighth Amendment deliberate indifference claims against a nurse and a correctional officer based on lack of causation, the court noted that:

> both parties agree that the last possible opportunity for medical intervention to save Madden's life passed on October 27, 2016, so there is no evidence either Adriano's or Andrykowski's actions in the early hours of October 28, 2016, contributed to Madden's death. Nor does the record contain any evidence Andriano or Andrykowski caused Madden additional pain or suffering. This is one of those rare instances in which summary judgment based on causation is appropriate.

Id. (cleaned up). So too here.

Because plaintiffs have not come forward with sufficient evidence in response to the defendants' motion to permit a reasonable jury to find for the plaintiffs on the causation issue, the defendants are entitled to summary judgment on all the plaintiffs' claims.

## IV.  CONCLUSION

For the reasons I have explained in this memorandum and order, all of the plaintiffs' claims except their Fourteenth Amendment medical care and ADA claims against Strafford County fail because plaintiffs cannot prove that any of the other defendants they have sued acted with indifference to either Burson's medical needs or her rights under the ADA. In addition, all of the claims fail because Burson cannot prove that any of the defendants caused her death. Defendants' motions for summary judgment, Doc. 33 and Doc. 34, are granted. The clerk shall enter judgment and close the case.

SO ORDERED.


/s/ Paul J. Barbadoro
Paul J. Barbadoro
United States District Judge

November 12, 2024

cc:    Counsel of Record